**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**JAMES G. BURGESS**                                                                                                   **PLAINTIFF**

**CASE NO. 4:05-CV-1760 GTE**

**TRUSTMARK INSURANCE COMPANY**                                                          **DEFENDANTS**

**<u>ORDER</u>**

Presently before the Court is Plaintiff's Petition for Statutory Penalty and Attorney's Fees.

**I. Background**

In 1991, Plaintiff, Dr. James Burgess, purchased a disability insurance policy from Continental. At some point Continental assigned the obligations under the Policy to Trustmark, who began collecting the premiums from Dr. Burgess. The Policy, designated TV2308, provided for the payment of $14,000 per month after the 90 day elimination period in disability benefits for Dr. Burgess' lifetime if the disability commences before age 65 "resulting from injury," "to age 65 for disability commencing after age 60 resulting from sickness." Injury is defined as "accidental bodily injury that occurs while Your policy is in force and results directly and independently of all other causes in loss covered by the policy." Sickness is defined as "sickness or disease which is diagnosed or treated while Your policy is in force."

On July 31, 2004, Dr. Burgess was in an accident involving a tractor. He states that he attempted to return to work, but extreme pain prevented him from continuing. An MRI indicated that he had ruptured a disc, which exacerbated spinal stenosis, which Dr. Burgess claims he was unaware of having. Dr. Burgess left his medical practice in September 2004. When steroid injections and physical therapy failed to provide relief, Dr. Burgess underwent a CT. A

CT scan report dated December 27, 2004, listing Ron Williams as physician and signed by Dr. Jeffrey Hale, states, "Incomplete fracture," indicating "L-4."

On March 18, 2005, Trustmark sent a letter to Dr. Burgess stating in part:

> We would like to take this opportunity to outline the status of your claim under policy number TV2308.[1]
>
> As previously outlined to you, the policy defines *Injury* as follows:
> > "*Injury means accidental bodily injury that occurs while Your policy is in force and results directly and independently of all other causes in loss covered by the policy.*"
>
> We recently had your file reviewed by our Medical Consultant, a board-certified Neurologist. The Medical Consultant opined that your medical condition is mainly due to facet disease causing spinal stenosis. In addition, Dr. Williams' September 28, 2004 office note states that you complained of six months of back pain.[2] Furthermore, it appears that your alleged injury may have exacerbated the symptomatic facet disease, however, your medical condition does not appear to be solely due to an *Injury* "*directly and independently of all other causes.*" Therefore, your claim will be considered under the *Sickness* provision of the policy. Benefits are payable to the first anniversary date of your policy following your 65th birthday (February 16, 2008) for conditions due to the result of a *Sickness*.

Plaintiff asked Ms. Karen Burgess, Plaintiff's daughter-in-law, for help in pursuing his claims on his Trustmark disability policy. She states in her affidavit that in March 2005, after receipt of the letter "rejecting Dr. Burgess' injury claim," she informed Dr. Burgess that they would need to collaborate with a law firm in Little Rock. Mr. Coulter of Wilson, Engstrom,

---

[1] Each Trustmark letter provided to the Court contains this same introductory sentence.

[2] The September 28, 2004 letter from Dr. Williams regarding Dr. Burgess states in part, "For six months or so now he has had difficulty with back pain. It is mainly nonradicular, but occasionally will go down the back of the legs to the knee, but no further. It is aggravated predominantly by walking, sitting and bending. He has had no specific treatment for that. He brings along a MRI of the lumbar spine that shows degenerative disc disease and moderate stenosis at L3-4."

Corum and Coulter in Little Rock states in his affidavit that he first became involved in the case in March 2005.

In his affidavit, Mr. Coulter states that Trustmark had access to the December 2004 CT scan well before the March 2005 letter and for the entire time that he had been involved in the matter. Plaintiff Dr. Burgess alleges that he provided every medical release and record Trustmark requested.

On April 20, 2005, Mr. Coulter sent a letter to Trustmark stating, "we anticipate filing suit alleging that Dr. Burgess is entitled to full disability benefits for the rest of his life because he was disabled on an accident on his farm." Additionally, the letter stated that Dr. Burgess was going to negotiate the check sent to him without waiving his claim under the policy for the full payment under the "injury" provision of the policy. The letter also stated that the "check you have tendered is for payments that Trustmark owes regardles of whether the 'sickness' or 'injury' provisions govern the carrier's duties. . . . If you take a different position with regard to this, then you should notify us immediately." On April 28, 2005, Trustmark sent a letter to counsel for Dr. Burgess, including enclosed copies of letters dated December 9, 2005, and March 18, 2005, stating in part,

> Our decision was based upon the information we had available to us at the time of the decision. We would be happy to review any other information you wish to submit in regards to Dr. Burgess' claim. Again, please be aware that according to the terms of the policy, Injury is defined as: [restating definition].

The letter agreed with the assessment that the money previously sent to Dr. Burgess is payable regardless of the classification of "sickness" or "injury." The letter also stated that a representative of Trustmark "may have the opportunity to be in your area in the coming months. Please advise us of your availability to set up a mutually convenient time to meet."

On May 20, 2005, Dr. Burgess entered into a Contingent Fee Agreement with Mr. Nate Coulter and Ms. Karen Burgess to represent him with regard to his claims. The agreement provided that Dr. Burgess would "pay the law firms one-third (33 1/3%) of the gross amount collected." In his affidavit, Mr. Coulter states that he met with Trustmark's Field Claim Representative on July 6, 2005. According to Mr. Coulter, they discussed the fluctuations in Dr. Burgess' income, substantial farming losses arising out of the sale of some horses, Dr. Burgess' "history of back problems," a part-time job for the U.S. Air Force at a base, and a penalty on Dr. Burgess' retirement account. Mr. Coulter states that he "attempted to correct [the representative's] erroneous impressions that Dr. Burgess had somehow engineered a fall and manipulated his income in an attempt to defraud the carrier."

Mr. Coulter states that he wrote Trustmark on July 14, 2005, with Dr. Burgess' detailed responses to each of the Field Claim Representative's questions. He stated that he would file suit unless Trustmark honored its obligation to pay Dr. Burgess' full lifetime benefits arising out of his injury within thirty days. Mr. Coulter states that on November 1, 2005, he wrote Ms. Manger stating that he would "hold off on filing suit only until November 15, 2005.

On October 21, 2005, Trustmark sent a letter to counsel for Dr. Burgess stating in part,

> On September 1, 2005, we wrote to your client's Attending Physician, Dr. Ronald Williams, requesting additional information to assist us in our handling of Dr. Burgess' disability claim. However, to date we have not received a response. We have subsequently sent a follow up letter to Dr. Williams again requesting additional information. Any assistance you may provide in expediting our request would be greatly appreciated.
>
> In the interim, we have continued to provide your client with monthly Total Disability benefits. Please understand that we have issued these payments, on an exceptional basis, in an effort to be of service to your client, without waiving any of our right or defenses afforded by the contract or under law. Our payment of

>these benefits should not be construed as acceptance of liability for the period in which we are providing benefits.

On November 15, 2005, Trustmark sent a letter to counsel for Dr. Burgess stating that it "recently received a reply from Dr. Williams regarding our request for additional information, which was initially requested from him on September 1, 2005. We have referred this information to our Medical Consultant for review and once our review is complete, we will be in further contact with you regarding the status of your client's claim."

On November 17, 2005, Plaintiff filed the present breach of contract suit. Defendant filed an Answer on January 6, 2006. Pursuant to the Court's final scheduling order dated April 6, 2006, the case was set for jury trial beginning on September 25, 2006. On July 10, 2006, the Court referred the case to Magistrate Forester for a settlement conference, which was scheduled for August 22, 2006.

A report by Dr. Cynthia Passarelli dated August 21, 2006, references her previous medical reviews of 3/10/05 and 11/22/05. The report states that the previous records "included only the MRI reports documenting the insured's spinal stenosis. Additional information made available to me at this time has documented a compression fracture at L-2 and bilateral pars fractures. These two fractures are likely to have been the result of the insured's tractor accident in July of 2004."[3] The report also states, "CAT scan reports dated 12/27/04, 5/20/05, and 9/28/05 have now been made available for my review along with a note dated December 22, 2004 from Ronald N. Williams, M.D., neurosurgeon and another note from January 6, 2004 from Dr. Williams. . . .

---

[3]Although Dr. Passarelli's report states that she now has a "note from January 6, 2004 from Dr. Williams," it is possible that the cited date of this note is inaccurate. However, the Court does not have a copy of said note to reference. Regardless, the date of the note does not impact the Court's decision in this matter.

CAT scan of the LS spine . . . was performed on 12/27/04. . . . The impression was of an incomplete fracture of the let pars interarticularis and inferior pillar, which was described as being subacute at L3-4." She also notes that a "repeat CAT scan of the LS spine was performed on 5/20/05 and again showed the old compression fracture at L-2, as well as a bilateral pars interarticularis fracture at L-4." "A 3rd CAT scan of the LS spine was performed on 9/28/05 and was described as showing a facet fracture on the left at L-3 with multilevel disc disease." With regard to the prognosis, she states, "As there has been documented non-union of the fracture, this is not likely to improve with time."

In his affidavit, Mr. Coulter states that the morning of the settlement conference, Trustmark's counsel "showed up with his client's doctor's report, conceding that Dr. Burgess was disabled from a broken back suffered in July 2004." On September 19, 2006, the Court entered a Consent Judgment stating, "Defendant Trustmark Insurance Company has agreed that Plaintiff James Burgess is disabled as a result of the accidental bodily injury he suffered on July 31, 2004. For so long as Dr. Burgess cannot perform the substantial and material duties of his regular occupation, and for so long as he submits semi-annually to Trustmark a continuous claim form verifying his disability, Trustmark shall pay Dr. Burgess $14,000 a month for the rest of his life."

## II. Motion for Statutory Penalty and Attorneys' Fees

Plaintiff requests an award of the statutory 12% penalty and attorneys' fees pursuant to Arkansas Code Annotated § 23-79-208. Alternatively, Plaintiff argues that he is at least entitled

to his reasonable attorneys' fees under Arkansas Code Annotated § 23-79-209 and Arkansas Code Annotated § 16-22-308.[4]  Section 23-79-208 provides in pertinent part:

> (a)(1) *In all cases in which loss occurs and the* cargo, property, marine, casualty, fidelity, surety, cyclone, tornado, *life,* accident and health, medical, hospital, or surgical benefit *insurance company* and fraternal benefit society or farmers' mutual aid association or company liable therefor *shall fail to pay the losses within the time specified in the policy after demand is made, the person, firm, corporation, or association shall be liable to pay the holder of the policy or his or her assigns, in addition to the amount of the loss, twelve percent (12%) damages upon the amount of the loss, together with all reasonable attorney's fees for the prosecution and collection of the loss.* [Emphasis added.]

In an opinion by Judge Howard in this district, the court stated, "The penalty nature of section 23-79-208 'is directed against unwarranted delaying tactics of insurers.'" *McKee v. Federal Kemper Life Assur. Co.*, 726 F. Supp. 245, 247 (E.D. Ark. 1989), *aff'd* 927 F.2d 326, 328-329 (8th Cir. 1991) (quoting *Simmons First National Bank v. Liberty Mutual Insurance Co.*, 282 Ark. 194, 198, 667 S.W.2d 648 (1984)).  "The legislature has recognized a social and moral purpose in providing for the allowance of a statutory penalty and attorney's fees in litigation between insured and insurer.  These reasons include discouraging oppressive delay in recognition of liability, deterring arbitrary or capricious denial of claims, and insuring the ability of claimants to obtain legal representation." *Id.* (citing *USAA Life Insurance Co. v. Boyce,* 294 Ark. 575, 578, 745 S.W.2d 136 (1988)).  "The Arkansas courts have recognized that because the statute is highly penal in nature it is to be strictly construed." *Id*. (citing *Callum v. Farmers Union Mutual Ins.,* 256 Ark. 376, 381, 508 S.W.2d 316 (1974).

---

[4]Although Plaintiff's Petition states that he seeks reasonable attorneys' fees under Arkansas Code Annotated § 23-79-209, and this statute is referenced in his Reply Brief, his Memorandum Brief in Support discusses the award of attorneys' fees pursuant to Arkansas Code Annotated § 16-22-308 for breach of contract.

"The Arkansas courts have also acknowledged that there are 'many exceptions to liability for the statutory penalty and attorney's fee'." *Id*. (citing *Federal Life & Casualty Co. v. Weyer*, 239 Ark. 663, 667, 391 S.W.2d 22 (1965)). "Thus, the Arkansas courts have specifically found that the language in 23-79-208 . . . 'shall fail to pay the same within the time specified in the policy after demand made therefor' contemplates that the insurer shall have a reasonable time to make necessary investigation in reference to the loss and the circumstances thereof after demand." *Id*. at 247-48 (citing *Clark v. New York Life Ins. Co.*, 245 Ark. 763, 768, 434 S.W.2d 611 (1968)). "In *Clark v. Paul Revere Life Ins. Co.*, 417 F.2d 683 (8th Cir.1969), the court refused to impose absolute liability on the insurer for failing to settle the claim within sixty days from the filing of the claim." *Id*. at 248. "The Eighth Circuit, relying on the recently decided cases of *Clark v. New York Life Ins. Co.*, 245 Ark. 763, 434 S.W.2d 611 (1968) and *Clark v. National Life & Accident Ins. Co.*, 245 Ark. 563, 433 S.W.2d 151 (1968), found that Arkansas courts allowed insurers a reasonable time to investigate claims." *Id*. "Under the facts before it, the Eighth Circuit refused to impose the penalty and attorney's fees." *Id*. This principle still remains good law. *See, e.g., Primerica Life Ins. Co. v. Watson*, 362 Ark. 54, 62 (2004).

In *McKee*, the court stated that "failure to pay the claim within sixty days of receipt of the proof of loss does not result in automatic liability under the penal provisions of section 23-79-208. Even under the penalty statute, an insurer has a reasonable time to investigate a claim. What is reasonable depends on the facts and circumstances of the case. A penalty may well be imposed in situations of unwarranted delay or refusal to pay." 726 F. Supp. at 248. In denying the claim for an award of a 12% penalty and attorney's fees, the Court found under the facts of the case that the defendant paid the claim "only a few days after the sixty day time period of section 23-81-

113(b),"[5] as soon as it completed a reasonable investigation. *Id*. However, there, the investigator was unable to obtain certain information until plaintiff returned to town, certain information had to be obtained concerning the decedent's medical condition and other insurance policies, and defendant needed to obtain information concerning the automobile accident which resulted in the death. *Id*.

"The fact that the insurance company later paid the claim does not defeat the award of penalty and attorney's fees for '[i]t is well settled that attorney's fees and penalty attach if the insured is required to file suit, even though judgment is confessed before trial.'" *Farm Bureau Mut. Ins. Co. of Arkansas, Inc. v. David*, 324 Ark. 387, 391-393, 921 S.W.2d 930, 932-933 (1996) (citing *Federal Life & Casualty Co. v. Weyer,* 239 Ark. 663, 666, 391 S.W.2d 22, 23 (1965)).

In *David*, the Arkansas Supreme Court upheld the trial court's finding that the period of time from filing the proof of loss to confession of judgment was unreasonable, as the insurer "was in a position to pay or deny the claim at the expiration of the sixty-day period," and the insurer did "not demonstrate[] a need to continue to investigate the claim past the expiration of the sixty-day period set by the policy and statute." *Id*. at 393. There, "[p]roof of loss was received on September 19, 1994; a general authorization was signed in September, shortly after the proof of loss; the [appellee] was deposed on November 8th; on November 10th a demand for payment in full on or before December 1st was made; the complaint was filed on December 1st; an answer denying liability was filed on December 15th; and, judgment was confessed on January 5, 1995."

---

[5] Arkansas Code Annotated § 23-81-113(b), which applies to the settlement of life insurance policies and annuities, requires that "if any insurer shall specify a particular period prior to the expiration of which settlement shall be made, the period shall not exceed two (2) months from the receipt of the proofs." Ark. Code Ann. § 23-81-113(b).

*Id*. at 389.  In *David*, the court noted that the delay was not due to the fault or inaction of the plaintiff.  *Id*. at 393.

Similarly in *Silvey Cos. v. Riley*, 318 Ark. 788, 888 S.W.2d 636 (1994), the Arkansas Supreme Court upheld the trial court's determination that "it was not reasonably necessary for the insurance company to continue to investigate the case for more than sixty days after the proof of loss was submitted." In that case, the insured's home was destroyed by fire on June 9, 1992, and "the insurance company was notified of the fire the day after it occurred and assigned an adjusting firm to investigate the loss."  By June 22, 1992, it had concluded the fire was of incendiary origin, and within thirty days after the fire [the insurer] had set up its arson defense."  The insurer took sworn statements from the insured and his wife, and, "within sixty days of the fire, it was in position to either admit or deny the claim."  *But see, e.g., Clark v. New York Life Ins. Co.*, 245 Ark. 763, 764-765, 434 S.W.2d 611, 612 (1968) (holding that there was not an unreasonable delay when the insured died on March 19, 1967, from a pistol wound in the side of his head, proof of loss form was filed on April 18, 1967, a homicide charge was filed against the widow on April 25, 1967, on June 20, 1967, suit was filed for the proceeds of the policy, insurer admitted the accidental death of the insured by Answer filed on July 11, 1967, on August 23, 1967, checks were issued and delivered to all the beneficiaries except the widow).

Plaintiff argues that by the end of 2004, the available medical evidence demonstrated conclusively that Dr. Burgess' disability was due to his accidental injury.  Plaintiff states that nevertheless, Trustmark took the position that his claim would be considered under the "Sickness" provision, rather than the "Injury" provision, and that his monthly benefits were payable only until

the policy anniversary date following his 65th birthday. Plaintiff argues that this position was confirmed in writing by Trustmark in March 2005.

Plaintiff argues that waiting on Trustmark to act on its denial until February of 2008 was not a viable option, nor was it required by Arkansas law. Once Trustmark rejected Dr. Burgess' claim for "injury" benefits, he had no choice but to seek a legal remedy, as the policy itself requires that suit be brought within three years; the eye-witnesses were fence repairmen; and the diagnosing physician had reached retirement age. Furthermore, Plaintiff states that he "would surely have been without any benefit for the length of the litigation" had he begun the process in 2008.

Plaintiff further argues that after the settlement conference, Trustmark's counsel disclosed an insuring agreement that may require another carrier to pay Dr. Burgess his monthly benefits. Plaintiffs assert that under the reinsuring agreement, Trustmark would have had to identify the status of Dr. Burgess' claim to the third party insurer. Plaintiff suspects that Trustmark told this third party insurance company that there was no obligation to make payments beyond February of 2008 because he was disabled from "sickness," not "injury." Plaintiffs argue that "[u]nless Trustmark can produce documents confirming that it really did NOT deny Dr. Burgess' claim's validity to the third party insurer or reinsurer, the Court should disregard Trustmark's claims that it did not dispute Dr. Burgess' claim, and therefore did not require Dr. Burgess to obtain counsel and incur the fees he has had to pay to get his rightful benefits." The Court notes that Trustmark did not address this issue in its response.

Defendant also argues that it has not "fail[ed] to pay" Dr. Burgess as required by Arkansas Code Annotated § 16-22-308. Defendant states that the lawsuit concerns the right to benefits

beginning in 2008, and that Trustmark has paid each monthly benefit, to date, to which Dr. Burgess is entitled.  Furthermore, Defendant argues that Plaintiff should not be awarded attorneys' fees or the statutory penalty because the March 18, 2005, letter was "far from Trustmark's final word on the matter," as it stated that Dr. Burgess' claim would be "considered" under the *Sickness* provision.  Defendant characterizes the March 18, 2005, letter as an "initial determination letter." In support of this assertion, Defendant cites the April 28, 2005, letter that states Dr. Burgess is entitled to the money sent to him "regardless, whether or not the claim is classified under the *Injury* or *Sickness* provision of the policy."  Defendant also relies on the language in that letter stating, "[w]e would be happy to review any information you wish to submit in regards to Dr. Burgess's claim."  Defendant notes the October 21, 2005, request for clarification from Dr. Burgess' treating physician as to why surgery was not an option for treating his condition.  Defendant also relies upon an "internal action plan."

     In context, the statements relied upon by Defendant do not adequately support its argument.  It is clear to the Court that Trustmark's March 18, 2005, letter constituted a statement of its decision that Dr. Burgess' claim fell within the sickness provision of the policy, and not the injury provision of the policy.  Therefore, although both parties admit that Dr. Burgess was due the benefits he received prior to February 2008 regardless of whether he was receiving the benefits under the sickness or injury provision, he was actually receiving the pre-2008 benefits under the sickness provision of the policy.  Dr. Burgess rightfully contested this determination by Trustmark upon Trustmark's refusal to recognize the evidence to the contrary available to it.  When Dr. Burgess submitted his claim statement, it is clear that he did so under the injury provision of the policy.  The form provides separate areas for sickness and accident, and Dr. Burgess filled out the

accident portion. While Trustmark did pay certain loss benefits to Dr. Burgess, it failed to pay under the proper loss provision, which would have substantial consequences to Dr. Burgess in the near future.

Defendant also argues that it had reason to examine Dr. Burgess' claim carefully. Defendant points to Dr. Burgess' report of six months of difficulty with back pain and the MRI showing degenerative disc disease and moderate stenosis. Defendant also states that Dr. Burgess related his back problems to the tractor accident in the insured statement dated November 8, 2004, but he also characterized his condition as a ruptured disc that had exacerbated spinal stenosis. However, Defendant admits that "Dr. Burgess and his counsel made several attempts to cause Trustmark to focus on the CT scan report showing a non-union lumbar fracture, as well as Dr. Williams'[] revised opinion that it was the fracture, and not stenosis, that caused his patient's back problems." Defendant also argues that Dr. Burgess' physician's statement dated November 16, 2004, indicated that surgery was a possibility for treatment. Defendant states that for the next several months it sought to determine from Dr. Williams why surgery to repair a herniated disc would be "very risky." However, Defendant admits that a response to this issue was received days before the lawsuit was filed, approximately nine months before Defendant conceded.

Importantly, Trustmark admits that it "did not immediately note the report of a December 27, 2004, CT scan submitted by Dr. Burgess." Dr. Passarelli's report dictated August 21, 2006, indicates that Defendant only recently gave her the December 2004 and subsequent CT scans. She states, "CAT scan reports dated 12/27/04, 5/20/05 and 9/28/05 have now been made available for my review . . . The previous records included only the MRI reports documenting the insured's spinal stenosis. Additional information made available to me at this time has documented a

13

compression fracture . . . ." Even if Defendant had reason to examine the claim carefully, Defendant can point to no reason that the examination took at least seventeen months to complete.[6] Defendants cannot bury its head in the sand in continuing to rely on an initial diagnosis when that diagnosis is updated and clarified shortly thereafter with significant medical evidence. Therefore, the Court finds that Plaintiff is entitled to attorneys' fees and the 12% statutory penalty.

**III. Calculation of Attorneys' Fees and Statutory Penalty**

As noted above, Dr. Burgess entered into a Contingent Fee Agreement with Mr. Nate Coulter and Ms. Karen Burgess to represent him with regard to his claims. The agreement provided that Dr. Burgess would "pay the law firms one-third (33 1/3%) of the gross amount collected."

In his affidavit, Mr. Coulter states, "I have itemized entries for the majority of my time on this case, but typically in contingency fee matters I do not record all of my time spent on the file. To prepare this affidavit, I have reviewed the files and retraced the steps I have taken in the case from the beginning. Based on the itemized entries and other time spent, I estimate that I have spent a total of 100 hours on this matter since March 2005. My partner, Gary Corum, has also worked on the case and I estimate that he has spent a total of 60 hours on the case. Thus, my firm has spent approximately 160 hours on this matter. We have paid $664.68 in out-of-pocket expenses in the case." However, he states that "[w]e are not due to receive a portion of any of the payments until February 2008, so the prospects of our getting paid, if at all, are deferred for a

---

[6]The date Dr. Burgess submitted the "proof of loss" is not clearly set forth by the parties. Therefore, the Court assumes that such proof of loss was submitted at least by the date of the March 18, 2005, letter, which Trustmark purports sets forth an "initial determination."

prolonged period, almost three years from the date of our first involvement with the case," noting that if Dr. Burgess does not live beyond February 2008, they may never get paid. "These risk factors justify the premium on our normal hourly rates." He states a normal hourly billing rate for non-contingency fee matters of $250 an hour.

Ms. Burgess states that she spent approximately 155 hours, and her partner, Miguel Rodriguez spent approximately 10 hours on the case. Her normal hourly billing rate for non-contingency fee matters is $300 an hour, and Mr. Rodriguez's is $250 an hour. She states that her firm has about $1,000 in out-of-pocket expenses. Therefore, the combined efforts of the attorneys in this matter is 325 hours ($89,000 at the non-contingency fee filing rate) and approximately $1,664.68 in expenses.

Plaintiffs claim that the appropriate calculation of the contingency fee in this case is $652,556, or one-third of $1,957,669.43, the present value of the benefit conferred[7] upon Dr. Burgess. The benefit conferred upon Plaintiff is the present value of the $14,000 a month lifetime disability income benefits due Plaintiff beginning in February 2008 that Plaintiff claims he would not have received without this lawsuit. Plaintiff submits the affidavit of Harry L. Ehrenberg, Jr., the owner of Harry L. Ehrenberg & Assoc., Inc., a life insurance agency. Mr. Ehrenberg based this figure on the cost of a single premium immediate annuity, which mirrors the benefits from a disability income policy, and also guarantees to pay a lifetime income with similar default risk. The calculation assumes a life expectancy of Mr. Burgess of 16.8 years and a discount rate of 4.08%. Plaintiff also claims a 12% statutory penalty of $234,920, or 12% of $1,957,669.

---

[7]Assuming Dr. Burgess survives for the estimated 16.8 years, he will collect approximately $2,822,400.

Plaintiff argues that the contingency fee calculation must be based on the present value of future payments which is the benefit conferred on the plaintiff by the litigation, citing *Continental Cas. Co. v. Vardaman*, 232 Ark. 773, 340 S.W.2d 277 (1960) (holding that while the attorney's fees appear to be out of proportion to the actual amount of recovery, the court was entitled to consider the fact that the services of plaintiff's attorneys tended to establish the insurer's liability for future payments, as by stipulation it was established that insurer's potential liability under the policy had a present value to plaintiff of more than $20,000). As in *Silvey*, Defendant Trustmark does not contest the suggested method of calculation. *See* 318 Ark. at 791. Rather, Trustmark argues that it does not owe any penalty and attorneys' fees. *Id.*

"The following factors are relevant in determining reasonable fees: 1) the experience and ability of the attorney; 2) the time and labor required to perform the service properly; 3) the amount in controversy and the result obtained in the case; 4) the novelty and difficulty of the issues involved; 5) the fee customarily charged for similar services in the local area; 6) whether the fee is fixed or contingent; 7) the time limitations imposed upon the client in the circumstances; and 8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the attorney." *Phelps v. U.S. Credit Life Ins. Co.,* 340 Ark. 439, 442, 10 S.W.3d 854, 856 (2000). "While the courts should be guided by the foregoing factors, there is no fixed formula in determining the reasonableness of an award of attorney's fees." *Id.*

For example, in *U.S. Credit Life Ins. Co.,* the Arkansas Supreme Court approved an attorney fee award based upon a one-third contingency fee arrangement. *Id.* at 443. The Court held that the trial court properly considered the fact that the plaintiff's attorney took the case on a

contingency basis as a factor in arriving at a reasonable fee. *Id.* Counsel acknowledged that his office's records were not completely accurate, stating that "we had not kept this matter entirely timed during the work we were doing on it because of it being a contingency fee case." *Id*. The Court recognized that "the total time allegedly spent on the case was merely an estimation arrived at after the fact," but that "the time spent on a case is but one factor to consider." *Id*. (upholding an award of attorney's fees in the amount of $5,433.13, plus costs of $651.40, on a total judgment of $16,299.40 when counsel originally sought $11,812.50 for an estimated 94.5 hours at $125 an hour).

The Court also stated that "the fee provided for in section 23-79-208 'is allowed only to reimburse an insurance policyholder or beneficiary for expenses incurred in enforcing the contract and to compensate him in engaging counsel thoroughly competent to protect his interests.' The fee is not the property of the attorney; instead, it is indemnity to the litigant." *Id*. The Court further stated that "the fee awarded should not exceed the amount that the client is responsible for paying, otherwise the statute would be susceptible to abuse. The purpose of the statute is not to provide a windfall to attorneys; rather, it is to permit the insured to obtain competent representation." *Id*.

Relying in part on *U.S. Credit Life Ins. Co.*, the Arkansas Court of Appeals upheld a court's award of $30,589.86 in attorney fees, which was forty percent of the amount recovered under the policies, plus penalty and prejudgment interest. *Capitol Life and Acc. Ins. Co. v. Phelps*, 76 Ark. App. 428, 434, 66 S.W.3d 678, 682 (2002). The plaintiff argued that her agreement with her counsel was that, if the case should be appealed, counsel would be entitled to

forty percent of the amount recovered. *Id*. Counsel claimed over 350 hours[8] spent on the case, although the itemized statement she attached showed only the activity entries, not the time spent because the case was a contingency case. *Id*.

Plaintiff cites several cases in which the contingency fee exceeded the hourly rate. *See e.g., Fuller v. Hartford Life Ins. Co.*, 281 F.3d 704 (8th Cir. 2002);[9] *Southern Farm Bureau Life Ins. Co. v. Cowger*, 295 Ark. 250, 748 S.W.2d 332 (1988) (assessing a 33% contingency fee on actual damages equivalent to roughly three times the hourly rate);[10] *Home Mut. Fire. Ins. Co. v. Jones*, 63 Ark. App. 221, 231, 977 S.W.2d 12, 17-18 (1998) (assessing a 40% contingency fee equivalent to 2x the hourly rate despite insurer's purported good faith).[11] Plaintiff recognizes that the cost of the "indemnity to the litigant" is more severe in this case, but states that Trustmark had

---

[8] The Court notes that the Arkansas Court of Appeals did not state the hourly rate of the plaintiff's counsel. However, for 350 hours, the $30,589.86 awarded would equal less than $90 an hour.

[9] The plaintiff had entered into a one-third contingency fee agreement in an insurance case with $500,000 policy limits . The district court awarded plaintiff $125,000 in attorneys' fees. The effective hourly rate stated to the Court was $350, although the plaintiff's counsel did not have an actual hourly rate for plaintiff's work because he generally charged a contingent fee. He arrived at the effective hourly rate by dividing the annual income he generated from plaintiff's work by the amount of time he spent on such matters. Plaintiff's counsel estimated 250-300 hours were spent on the matter, plus 90-100 hours by an associate attorney, plus an additional 20 hours by a paralegal.

[10] The trial court awarded plaintiff $33,000 in attorneys' fees when the total award to plaintiff was over $120,000. The plaintiff's attorney stated to the trial court that he spent 104.9 hours, excluding the early conferences, and had a regular hourly fee of $80. He also stated that he charged $2,000 for trial (2 days at $1,000 per day), $800 per day for the presence of his associate attorney at the trial, $438.50 for court reporter fees and depositions, $12.90 in telephone charges, and $7.20 in postage.

[11] The trial court awarded $36,600 in attorneys' fees, an amount which is 40% of the $91,500 awarded to the plaintiffs. The attorneys also submitted time sheets reflecting 120.75 hours of work at the rate of $150 per hour, for a total of $18,112.50.

ample notice of the risk and that Dr. Burgess intended to try to impose his fees on Trustmark if they did not retreat from the denial of his claim.

As stated above, Plaintiff's claim that the appropriate calculation of the contingency fee in this case is $652,556, or one-third of $1,957,669.43, the present value of the $14,000 a month lifetime disability income benefits due Plaintiff beginning in February 2008, which assumes a life expectancy for Dr. Burgess of 16.8 years and a discount rate of 4.08%. Plaintiff also claims a 12% statutory penalty of $234,920, or 12% of $1,957,669. The Court notes that the combined efforts of the attorneys in this matter is 325 hours, which amounts to $89,000 at the attorneys' non-contingency fee rate, and approximately $1,664.68 in expenses. The Court also notes the risk in accepting Plaintiff's case on a contingency fee basis. The Contingent Fee Agreement, which is included in Mr. Coulter's affidavit, sets forth the terms, including "Upon the occurrence of the contingency described in Paragraph 2 [the recovery of funds upon settlement or trial of the matter], the Client will pay the law firms one-third (33 1/3 %) of the gross amount **collected**." (Emphasis added). Therefore, it appears that if the Court denied attorneys' fees, arguably, the attorneys in this matter could only collect their one-third fee as Dr. Burgess received payments beginning February 16, 2008, unless the attorneys and Dr. Burgess reached some alternative agreement. According to the Court's calculations, these payments would equal approximately $56,000 per year beginning in February 2008 for the life of Dr. Burgess. The Court also considers the affidavits of the attorneys, including the attached exhibits, and Ms. Burgess' representation that the law firms representing Dr. Burgess have a total of ten full-time attorneys.

After considering the factors set forth in *Phelps*, *supra*, and the entire record in this matter, the Court finds that $180,000 constitutes a reasonable amount of attorneys' fees. Furthermore, the Court awards statutory penalties in the amount of $234,920.

Accordingly,

IT IS THEREFORE ORDERED that the Plaintiff's Petition for Statutory Penalty and Attorneys' Fees (Dkt. #13) be, and it is hereby, GRANTED. Attorneys' fees in the amount of $180,000 are hereby awarded to Plaintiff. A statutory penalty in the amount of $234,920 is awarded to Plaintiff.

Dated this 13th day of February, 2007.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE